**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                            :
ANTHONY JULIEN,             :
                            :          Civil No. 02-3080 (FSH)
            Petitioner,     :
                            :
        v.                  :
                            :               OPINION
ROY L. HENDRICKS, et al.,   :
                            :
            Respondents.    :
_____:
```

**APPEARANCES:**

      ANTHONY JULIEN, Petitioner Pro Se
      SBI# 977696B
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625

      IAN S. CLEMENT, ESQ.
      ASSISTANT PROSECUTOR, ESSEX COUNTY PROSECUTOR'S OFFICE
      50 Market Street
      Newark, New Jersey 07102
      Attorneys for Respondents

**HOCHBERG, District Judge**

      This matter is before the Court on petitioner Anthony Julien's application for habeas corpus relief under 28 U.S.C. § 2254. For the reasons stated below, the petition for habeas relief will be denied for failure to make a substantial showing of a federal statutory or constitutional deprivation.

I.   <u>BACKGROUND</u>

A.   <u>Procedural History</u>

Petitioner, Anthony Julien ("Julien"), is presently confined at the New Jersey State Prison in Trenton, New Jersey.  He challenges a July 28, 1995 state court conviction and sentence imposed by the Superior Court of New Jersey, Law Division, Criminal Part, Essex County.

Julien was indicted on August 16, 1994 by an Essex County Grand Jury on the following offenses: Count 1: first degree robbery, in violation of N.J.S.A. 2C:15-1; Count 2: first degree felony murder, in violation of N.J.S.A. 2C:11-3a(3); Count 3: knowing and purposeful murder of Selvon Davis in the first degree, in violation of N.J.S.A 2C:11-3a(1),(2); Count 4: third degree possession of a firearm without a permit, in violation of N.J.S.A. 2C:39-5(b); and Count 5: second degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4a.  (Respondent's Exhibit A).[1]

---

[1]  In answering the habeas petition, Respondents submitted the following documentary materials for review:

    Exhibit A:  Essex County Indictment No. 4268-12-94
    Ex. B:  Judgment of Conviction
    Ex. C:  Petitioner's Notice of Appeal
    Ex. D:  Order granting motion to file notice of appeal *nunc pro tunc*
    Ex. E:  Petitioner's Brief on direct appeal
    Ex. F:  Petitioner's *pro se* Brief on direct appeal
    Ex. G:  State's Brief in opposition to direct appeal
    Ex. H:  February 7, 1997 Appellate Division opinion denying direct appeal

On June 20, 1995, the Honorable Francine A. Schott, J.S.C., conducted a <u>Wade</u> hearing on the out-of-court identification of Julien by witness Gilly Williams.   Judge Schott denied defendant's motion to suppress the identification testimony.   (2T 63:24-25).   Trial commenced on June 21, 1995 and concluded on June 30, 1995.   After the evidence had been presented, defense counsel requested a jury instruction on passion-provocation manslaughter, which was denied by the trial court.   The jury

---

Ex. I:  Petitioner's notice of petition for certification
Ex. J:  N.J. Supreme Court Clerk's notice to petitioner
Ex. K:  N.J. Supreme Court Order allowing petitioner to file petition for certification *nunc pro tunc*
Ex. L:  N.J. Supreme Court Order denying certification
Ex. M:  Petition for post-conviction relief ("PCR")
Ex. N:  Supplemental Brief in support of PCR
Ex. O:  State's Brief in opposition to PCR petition
Ex. P:  Law Division's Letter Opinion denying PCR
Ex. Q:  Petitioner's notice of appeal from PCR denial
Ex. R:  Petitioner's Brief on appeal from PCR denial
Ex. S:  Petitioner's *pro se* supplemental brief on appeal from PCR denial
Ex. T:  State's brief in opposition to appeal from PCR denial
Ex. U:  Appellate Division's opinion affirming PCR denial
Ex. V:  Petition for certification to N.J. Supreme Court
Ex. W:  N.J. Supreme Court Order denying certification
1T   June 20, 1995 transcripts of Wade hearing and other matters
2T   June 21, 1995 transcripts of pre-trial proceedings
3T   June 22, 1995 trial transcript
4T   June 27, 1995 trial transcript
5T   June 28, 1995 trial transcript
6T   June 29, 1995 trial transcript
7T   June 30, 1995 trial transcript
8T   July 23, 1995 transcript of motion for new trial and sentence proceedings
9T   transcript of post-conviction relief proceeding

found Julien guilty of Counts One and Two, robbery and felony murder, but acquitted defendant of the remaining charges on Counts Three through Five.  (7T 4:3-5:20).

On June 30, 1995, Julien's counsel moved for a new trial and to vacate the verdict as against the weight of the evidence.  The court denied both motions and sentenced Julien to 30 years in prison without parole.  (8T).  On October 25, 1995, Julien's counsel filed a Notice of Appeal and a motion to file a Notice of Appeal <u>nunc pro tunc</u>, which was granted by the Superior Court of New Jersey, Appellate Division on November 13, 1995.  The conviction and sentence were affirmed by the Appellate Division by unreported opinion on February 7, 1997 (Petition at ¶ 9).  Julien's petition for certification to the Supreme Court of New Jersey was denied on May 21, 1997.  (Petition at ¶ 9; Answer at ¶ 9).  Julien then filed a petition for post-conviction relief ("PCR") in state court on February 10, 1998.  (Petition at ¶ 11).  The state PCR petition was denied by Judge Schott in an unpublished letter opinion on August 9, 1999.  (Petition at ¶ 11(a)(6)).  On September 22, 2000, Julien appealed from the denial of his PCR petition.  The Appellate Division affirmed the state court's denial decision by an unpublished opinion filed on October 24, 2001.  (Petition at ¶ 11(b)).  The petition for certification to the Supreme Court of New Jersey was denied on March 20, 2002.  (Petition at ¶ 11(c)).

On or about June 21, 2002, Julien filed this petition for federal habeas relief under 28 U.S.C. § 2254.[2]  The State filed an answer to the petition, with the relevant state court record, on November 21, 2002.[3]

B.  Factual Background

The following rendition of facts is taken from the petition, the State's answer, and the state court record.

On August 16, 1994, three men confronted Selvon Davis in an apartment Davis shared with his girlfriend at 94 South Harrison Street in East Orange, New Jersey.  There was a loud argument; the men fled; and Davis was found dead.

The victim and petitioner were business partners in an illegal drug transaction involving ten pounds of marijuana.  On

_____

[2]  The Court finds that petitioner "filed" his habeas petition on the date he handed it to prison officials to be mailed to the Court for filing.  See Houston v. Lack, 487 U.S. 266, 276 (1988); Burns v. Morton, 134  F.3d 109, 113 (3d Cir. 1998)(incorporating the "mailbox rule" for habeas petitions submitted by inmates confined in an institution).  Because the Court does not know the exact date on which Julien handed his petition to prison officials for mailing, it will use the date on which he signed his petition, June 21, 2002.

[3]  Petitioner sent several letters to this Court requesting that copies of exhibits as provided to the Court by respondents be made available to him.  A careful review of petitioner's application for habeas relief and the brief in support of his petition demonstrates that petitioner had all of the relevant transcripts produced by the State.  Indeed, petitioner quoted and/or cited many sections of the trial transcript and the transcript of the Wade hearing in his supporting papers.  Therefore, petitioner's request for copies of the record is denied where it appears to be unnecessary and duplicative of what he already has.

August 16, 1994, the three men went to the victim's apartment and
allegedly argued over an amount of marijuana that was stolen from
the victim's "stash".  The argument led to a fight, which
resulted in the victim being shot to death.  The three men left
the victim on his back with his hands bound by tape.  They then
ransacked the apartment and stole several items belonging to the
victim and his girlfriend, Dana Bryant.

At trial, a witness, Gilly Williams, testified that he had
observed three men entering the victim's apartment before the
murder on August 16, 1994.  He also saw the same three men
running from the apartment after the shooting.  Williams
testified that before the men had entered the victim's apartment,
one of the men looked right at him.  In an out-of-court
identification, Williams picked Julien's picture out of several
photo arrays shown to him by the investigating police several
days after the shooting.  However, Williams was unable to
identify Julien in court.  Also at trial, Stephen Bessier, a
friend of Julien, testified that he had a conversation with
Julien in which Julien allegedly admitted that he had recently
fought and killed someone in the cities of Orange over a drug
deal "gone bad."  Dina Bryant, the victim's girlfriend, testified
about the marijuana.  She identified Julien and Hillary Edwards
as the victim's business partners in a drug operation.  She also
stated that property had been stolen from her apartment.  Hillary

6

Edwards testified that the victim was upset about a pound of marijuana that had been stolen from him.  Edwards stated that the victim blamed Edwards and Julien for the missing marijuana and demanded repayment.  Edwards said that he repaid the victim, but he was not sure if Julien had done so.

At trial, there was no direct, physical evidence placing Julien at the apartment; there was only Williams' testimony based on an out-of-court identification.  Four useable fingerprints were found at the apartment.  These four fingerprints did not match Julien, Bryant, the victim, or Edwards, and the police were unable to identify the fingerprints.  However, there was testimony by the police and by Williams that Williams and friends had entered the apartment after the shooting.

The jury found Julien guilty of first degree robbery and felony murder.  They acquitted him of the remaining charges of murder, possession of a weapon for an unlawful purpose, and possession of a firearm without a permit.

C.  The Wade Hearing

Before trial, the court conducted a Wade hearing with respect to the admissibility of Gilly Williams' out-of-court identification.  Defense counsel argued that the identification was unreliable and was made under suggestive circumstances.  The following persons testified at the Wade hearing: Gilly Williams; Detective Thomas Koundry of the East Orange Police Department;

7

and William Worrell, a criminal defense investigator employed with the Public Defender's office.

   Williams first testified about what he saw the night of the shooting.  He and a few friends were sitting on some steps inside the apartment building where the victim was killed.  One of Williams' friends opened the outside door to let the three men inside.  The men then went up the stairs to the victim's apartment.  Williams stated that two of the men leaned on the wall, while one of them knocked on the door.  He also stated that the area was brightly lit and that one of the men looked directly at him.  Williams looked at the man.  The other two shielded their faces.  When one of the men knocked on the victim's door and said "it's Tony", the victim let the men inside.  Williams then heard loud voices arguing, in what sounded like a foreign language.  He did not hear what was said.  He also testified that music was turned up loud so that the men could not be heard.  Feeling uncomfortable about the situation, Williams and his friends left the apartment building.  Shortly afterwards, Williams saw the three men running from the apartment.  Williams and his friends then went inside the apartment and found the victim lying on the ground.

   When the police arrived, Williams voluntarily went to them to give information about what he saw.  The police took Williams to the police station for the purpose of taking a statement.

8

Williams admitted that he lied to the police about his age, saying he was only 17 at the time, because he did not want to get involved.  Several days later, Williams again was taken to the police station to see if he could make an identification from photo arrays of any of the men he saw at the apartment on the night of the murder.  Williams stated that he recognized Julien's picture shortly after he saw it, but sat for almost two hours without making an identification.  He finally identified Julien's picture as that of the man he saw the night of the murder.  He admitted to the police that he was afraid that the man would come after him.  Then he told the police his correct age; he was eighteen years old at the time.

Williams also testified that he spoke with an investigator from the public defender's office by telephone.  He stated that he was irritated because he did not want to be bothered anymore with questions about the matter.  He told the investigator essentially what he told the police.  Williams also told the investigator that he was not going to go to court.  Williams testified that the investigator read selected parts of Williams' statement that had been given to the police.  Williams stated that he never told the investigator that the police or anybody else had indicated that a woman has selected Julien's picture.

Detective Koundry also testified about the circumstances of the photo identification conducted at the police station.  He

confirmed that Williams had sat for almost two hours.  The
detective also stated that he observed Williams looking at one
photo array for some time.  Koundry further testified that
Williams told him that he was reluctant to identify the picture
as one of the men he saw because Williams was afraid the man
would come after him.  Koundry confirmed that he did not tell
Williams that another woman had identified the picture of Julien.
Although he was not in the room the entire time, Koundry stated
that he never heard the other investigating officer tell Williams
that a woman had identified Julien.  Koundry stated that Dina
Bryant's identification of Julien took place several days later.

William Worrell was the investigator who had spoken to
Williams over the phone.  It was Worrell who testified that
Williams told him that he picked the defendant's picture because
"the cop told me that's the one the girl picked."  There was no
independent evidence or testimony to corroborate Worrell's
testimony.

At the conclusion of the testimony, the court ruled that
there was nothing in the out-of-court identification by Williams
that was so suggestive as to result in a substantial likelihood
of misidentification.  The court found that the photo arrays were
not suggestive in and of themselves, although there was no
challenge to the identification on that basis.  The only evidence
of suggestion that would warrant suppression was the alleged

10

statement by Williams to the investigator Worrell that the police told him that Julien's picture had been picked by "some girl". In this regard, the court found that Williams may have made the statement but he was not being truthful because Williams was "trying to get rid of [Worrell]", and wanted to be left alone. (2T 61:23-63:4).  The objective evidence did not support defense counsel's claim.  The court noted:

> The testimony makes clear that there was a woman who had given names of suspects, each of those suspects were included in the various photo arrays presented to Mr. Williams.  If in fact the statement that the officers told Mr. Williams who to pick out was truthful, there would be no reason why they would not also point out the other suspects to him as well and tell him to pick those other suspects out at the same time.

(2T 63:4-11).  The court ruled that there was no evidence of suggestibility based on the testimony.  The court also found that Williams was "quite certain in his identification".  Therefore the motion to suppress the out-of-court identification was denied.  (2T 63:18-25).

## II.  CLAIMS FOR HABEAS RELIEF

Julien raises the following claims in his federal habeas petition:

Ground One:  Petitioner should receive an evidentiary hearing on this matter.

Ground Two:  Petitioner's conviction must be reversed because eyewitness' out-of-court identification of petitioner's photo resulted in an irreparable mis-identification.

11

Ground Three:  The jury charge on the identification issue was fatally flawed.

Ground Four:  Ineffective assistance of trial counsel.

Ground Five:  Ineffective assistance of appellate counsel.

Ground Six:  The cumulative errors in the state trial proceedings warrant a new trial.

It appears from the state court record that all of petitioner's claims for habeas relief were presented to the state courts on direct and collateral review.  The State does not contend that any of the claims raised by petitioner here are unexhausted under 28 U.S.C. § 2254(b).

   III.  <u>STANDARDS GOVERNING PETITIONER'S § 2254 CLAIMS</u>

The Court recognizes that a <u>pro se</u> pleading is held to less stringent standards than more formal pleadings drafted by attorneys.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  Thus, a <u>pro se</u> habeas petition should be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>Duarte v. Hurley</u>, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Julien is proceeding <u>pro se</u> in his application for habeas relief, the Court will accord his petition the liberal construction intended for <u>pro se</u> litigants.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

>  (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
>  (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>  (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  Williams, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the

state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id.  Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." Id. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  Id. at 411.  See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines

that the state court's decision was not "contrary to" applicable
Supreme Court precedent, then the court takes the second step of
the analysis under § 2254(d)(1), which is whether the state court
unreasonably applied the Supreme Court precedent in reaching its
decision.  <u>Werts</u>, 228 F.3d at 197.

This second step requires more than a disagreement with the
state court's ruling because the Supreme Court would have reached
a different result.  <u>Id</u>.  AEDPA prohibits such <i>de novo</i> review.
Rather, the federal habeas court must determine whether the state
court's application of the Supreme Court precedent was
objectively unreasonable.  <u>Id</u>.  In short, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court
precedent.  <u>Id</u>.; <u>see also</u> <u>Jacobs v. Horn</u>, 395 F.3d 92, 100 (3d
Cir. 2005).

Finally, federal courts are required to apply a "presumption
of correctness to factual determinations made by the state
court."  <u>Id</u>.; <u>see also</u> 28 U.S.C. § 2254(e)(1).  The Third Circuit
has ruled that this presumption of correctness based upon state
court factual findings can only be overcome by clear and
convincing evidence.  <u>See</u> <u>Duncan</u>, 256 F.3d at 196 (<i>citing</i> 28
U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must
clear a high hurdle before a federal court will set aside any of

15

the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

IV.   ANALYSIS OF PETITIONER'S CLAIMS

Having set forth the analytical framework for a habeas review under § 2254(d)(1), the Court will now address the claims presented by Julien in his petition for habeas relief.

A.   Request for an Evidentiary Hearing

Julien seeks an evidentiary hearing in this matter concerning the out-of-court identification of Julien by eyewitness, Gilly Williams, and the statement made by Stephen Bessier concerning petitioner's admission about committing a murder.   Respondents contend that all of the facts concerning the out-of-court identification claim were fully explored in a pre-trial hearing conducted pursuant to N.J.R.E. 104(a) and United States v. Wade, 388 U.S. 218 (1967).

Prior to enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996), the Supreme Court held that "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." Townsend v. Sain, 372 U.S. 293, 312 (1963).   Indeed, in certain circumstances, an evidentiary hearing was mandatory.

> Where the facts are in dispute, the federal court in
> habeas corpus must hold an evidentiary hearing if the

16

habeas applicant did not receive a full and fair
evidentiary hearing in a state court, either at the
time of the trial or in a collateral proceeding.  In
other words a federal evidentiary hearing is required
unless the state-court trier of fact has after a full
hearing reliably found the relevant facts.

...

[A] federal court must grant an evidentiary hearing to
a habeas applicant under the following circumstances:
If (1) the merits of the factual dispute were not
resolved in the state hearing; (2) the state factual
determination is not fairly supported by the record as
a whole; (3) the fact-finding procedure employed by the
state court was not adequate to afford a full and fair
hearing; (4) there is a substantial allegation of newly
discovered evidence; (5) the material facts were not
adequately developed at the state-court hearing; or (6)
for any reason it appears that the state trier of fact
did not afford the habeas applicant a full and fair
fact hearing.

Id. at 312-13.  The Supreme Court later refined this standard

with respect to the fifth circumstance enumerated in Townsend,

requiring a prisoner to "show cause for his failure to develop

the facts in the state-court proceedings and actual prejudice

resulting from that failure," but not otherwise curtailing the

Townsend list.  Keeney v. Tamayo-Reyes, 504 U.S. 1, 11 (1992).

Keeney's threshold standard of diligence was codified by AEDPA in

the opening clause of new 28 U.S.C. § 2254(e)(2).  Williams v.

Taylor, 529 U.S. 420 (2000).

Title 28 Section 2254(e) now defines the circumstances under

which a federal district court may grant an evidentiary hearing.

It provides:

17

(e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-

(A)  the claim relies on-
(i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or
(ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

Thus, if a prisoner fails to develop the factual basis of a claim in State court proceedings, through some lack of diligence or greater fault attributable to the prisoner or the prisoner's counsel, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). Williams, 529 U.S. at 429-37.  Conversely, where the facts have not been developed in State court proceedings through no fault of the prisoner or the prisoner's counsel, the prisoner is "excused from showing compliance with the balance of the subsection's requirements."  Id. at 437.

However, even if a new evidentiary hearing is
permitted under AEDPA--when it is solely the state's
fault that the habeas factual record is incomplete--
AEDPA, unlike Townsend and Keeney, does not require
that such a hearing be held.  Instead, federal courts
have discretion to grant a hearing or not.  In
exercising that discretion, courts focus on whether a
new evidentiary hearing would be meaningful, in that a
new hearing would have the potential to advance the
petitioner's claim.

Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000), cert.

denied, 531 U.S. 1084 (2001).

Here, Julien seeks an evidentiary hearing on the out-of-court identification issue, which he contends will determine the likelihood of mis-identification.  He claims that the Wade hearing was inadequate.  Petitioner relies on the factors set forth in Townsend to support his claim for an evidentiary hearing.

In petitioner's brief, Julien contends that trial court's determination that the identification was reliable and not impermissibly suggestive was not supported by the evidence.  He also claims that the facts were not adequately developed at the Wade hearing.  To support his arguments, Julien substantially lifts selected portions of Williams' testimony at trial and at the Wade hearing to create a general sense of confusion about the accuracy of Williams' identification.  For instance, Julien suggests that Williams was untruthful overall because he lied about his age.  Julien quibbles over Williams' testimony that the picture was a "likeness" of the man he saw in the hallway.  He

19

also stresses that Williams was unable to make an in-court identification of Julien.  None of Williams' friends at the time had identified petitioner.  Further, Williams was not an eyewitness to the actual crime.  Julien argues at length that Williams purportedly changed his story several times during the Wade hearing about which man he actually saw.  Finally, Williams' description as to height did not fit the petitioner's actual height.

All of these arguments bear on the weight of the evidence, not on the issue of admissibility as to whether or not the identification was impermissibly suggestive.  This was the main argument raised on the motion to suppress.  Defense counsel principally argued that Williams had told Worrell that he only picked Julien's picture because the police indicated that some girl picked that photograph.  This allegation is not corroborated by Williams or by the police.  Instead, the testimony by Williams showed that he initially told the police that he did not recognize any picture from the photo arrays, and that he continued to look at them for almost two hours, even though he recognized Julien's picture within 15 minutes, because he was scared.  Williams testified that he was afraid that the man would come after him.  The police also confirmed that Williams told them that he had been afraid to identify the picture for fear of his life.  Other than the testimony of the defense investigator,

20

there was no evidentiary support for the claim that the identification was impermissibly suggestive.  Furthermore, the trial judge concluded that Williams did make the statement to Worrell, but had done so to get Worrell to leave him alone. Williams also told Worrell that he was not going to testify at trial.

This Court finds nothing in the record, either at the trial itself, or at the <u>Wade</u> hearing, to show that the merits of the factual dispute were not adequately developed, reviewed, and resolved in the state court proceedings.  The factual finding of the trial court was fairly supported by the evidence, that is, Williams' out-of-court identification was found to be reliable and not impermissibly suggestive.  Julien does not allege any newly discovered evidence that could have been previously discovered through the exercise of due diligence.  He does not assert a new rule of constitutional law previously unavailable to him.  Further, he can demonstrate no material facts that would be sufficient to establish by clear and convincing evidence that the trial court's ruling was unreasonable.  Thus, even if petitioner claims that his counsel was deficient in failing to raise certain arguments or presenting other witnesses to dispute Williams' identification, such claims are not sufficient to warrant an evidentiary hearing under the grounds listed in § 2254(e)(2), as

noted above.[4]  Therefore, having reviewed the relevant transcripts and state court record, the Court finds no basis for allowing an evidentiary hearing on the issue of Williams' identification of petitioner, and petitioner's request is denied.

B.   Admission of Out-of-Court Identification at Trial

Julien next argues that the admission at trial of Williams' testimony concerning his out-of-court identification of petitioner constitutes reversible error.

While the Sixth Amendment does not require that defense counsel be present when a witness views police or prosecution photographic arrays, see United States v. Ash, 413 U.S. 300 (1973), an accused nevertheless is entitled to due process protection against the introduction of evidence of, or tainted by, unreliable identifications elicited through an unnecessarily suggestive photographic array, id. at 320; Manson v. Brathwaite, 432 U.S. 98, 110-17 (1977); Simmons v. United States, 390 U.S. 377 (1968) (due process prohibits in-court identification if pre-trial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

_____

[4]  This ineffectiveness of counsel claim is more fully discussed in the Opinion, infra, at Section IV.D, as well as petitioner's claim regarding the counsel's failure to interview witnesses to the conversation between Stephen Beisser and Julien concerning Julien's admission.

22

The Supreme Court has recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." Simmons, 390 U.S. at 383. The Court has identified certain procedures that heighten the risk of misidentification, including such practices as displaying the photo of only a single individual who generally resembles the person the witness saw, showing the witness photos of several persons among which the photograph of a single individual recurs or is in some way emphasized, or indicating to the witness that police have other evidence that one of the persons pictured committed the crime. Id. Despite the risk of misidentification, the Supreme Court has not prohibited the employment of photographic identification methods, either in the exercise of its supervisory power or as a matter of constitutional requirement. Id. Instead, the Court has required that each case must be considered on its own facts and must be evaluated in light of the totality of surrounding circumstances; also, the Court has noted that the risk of conviction based on photo misidentification "may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." Id.

Where there has been an unnecessarily suggestive pre-trial photographic identification of a suspect,

> reliability is the linchpin in determining the admissibility of identification testimony ... . The

23

> factors to be considered ... include the opportunity of
> the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy
> of his prior description of the criminal, the level of
> certainty demonstrated at the confrontation, and the
> time between the crime and the confrontation.  Against
> these factors is to be weighed the corrupting effect of
> the suggestive identification itself.

Manson v. Brathwaite, 432 U.S. at 114 (citing Neil v. Biggers,

409 U.S. 188, 199-200 (1972)).  "[C]onvictions based on

eyewitness identification at trial following a pretrial

identification by photograph will be set aside on that ground

only if the photographic identification procedure was so

impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification."  Simmons, 390 U.S.

at 383.  See also Stovall v. Denno, 388 U.S. 293, 302 (1967),

overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314

(1987).

Where a trial court has failed to exclude identification

evidence obtained in violation of a defendant's due process or

Sixth Amendment rights, the habeas court must determine whether

the failure to exclude that evidence was harmless constitutional

error under Chapman v. California, 386 U.S. 18 (1967).  See Moore

v. Illinois, 434 U.S. 220, 232 (1977).

The Court of Appeals for the Third Circuit has explained

that the

> Simmons/Stovall inquiry is essentially two-pronged.
> The first question is whether the initial
> identification procedure was "unnecessarily" or

24

"impermissibly" suggestive.  This inquiry actually
contains two component parts: "that concerning the
suggestiveness of the identification, and that
concerning whether there was some good reason for the
failure to resort to less suggestive procedures."  If a
procedure is found to have been unnecessarily
suggestive, the next question is whether the procedure
was so "conducive to ... mistaken identification" or
gave rise to such a "substantial likelihood of ...
misidentification" that admitting the identification
would be a denial of due process.

United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)

(citations omitted) (emphasis added by Third Circuit).

Here, Julien contends that the trial court should have

suppressed witness Gilly Williams' out-of-court identification

because it was unreliable and impermissibly suggestive.

Specifically, Julien contends that Williams' pre-trial

identification was flawed because: (1) Williams' told

investigator Worrell that he only picked the defendant's picture

because that's the one the girl picked; (2) his testimony at the

Wade hearing was inconsistent as to which man he actually saw;

(3) Williams' description of height and age did not match

petitioner; (4) Williams testified that the picture was a

"likeness" of the man he saw; (5) Williams initially told the

police that he did not recognize any of the pictures in the photo

arrays; (6) Williams spent almost two hours looking at the four

photo arrays before selecting petitioner's picture; (7) none of

Williams' friends at the time could identify petitioner; and (8)

Williams could not make an in-court identification.  Petitioner

also notes that, other than his alleged confession to Stephen
Beisser (in which he allegedly admitted that he shot a man over a
drug deal gone bad), the only evidence linking him to the crime
was Williams' identification.

Respondents counter that all of the relevant facts
pertaining to the alleged suggestiveness of Williams' out-of-
court identification were fully explored in the Wade hearing.
Moreover, the trial court found no impermissible circumstances of
suggestion at the police station identification and thus, no
likelihood of an "irreparable misidentification." Simmons, 390
U.S. at 383-84.

As noted above, the trial court held a Wade hearing
immediately preceding the trial, on June 20 and 21, 1995.  The
trial court made the following findings of fact: (1) that
Williams did tell investigator Worrell that he only picked
defendant's picture because the police told him some girl picked
the same photograph, (2T 62:11-16); (2) that Williams' statement
to Worrell was not truthful and was given so as to make the
investigator leave him alone, (2T 62:21-63:1); (3) there was no
objective evidence to support the defense motion's claim that the
police told Williams that another witness identified defendant's
picture, (2T 63:2-4); and (4) the victim's girlfriend, Dina
Bryant, had given the police the names of other suspects, and the
pictures of those suspects were also included in the photo

arrays; thus if the police had directed Williams, it is likely that they would have had him identify the other suspects also. (2T 63:4-11).

In denying the motion to suppress, the trial court ruled that there was no challenge to the suggestibility of the photo arrays themselves and that the petitioner failed to present any competent evidence of "suggestibility in the case whatsoever." (2T 63:12-19).  The court concluded that Williams had ample time to observe the petitioner, and that Williams was "quite certain" of his identification.  (2T 63:20-25).

On direct appeal, the Appellate Division found that "[a]though a reluctant witness, Gilly Williams' identification of defendant from four photographic arrays was neither unreliable nor made under suggestive circumstances, citing Manson v. Brathwaite, 432 U.S. 98 (1977); Neil v. Biggers, 409 U.S. 188 (1972); and Simmons v. United States, 390 U.S. 377 (1968).  (Ex. H, Appellate Division Opinion, A-1248-95T4, filed February 7, 1997).  The Appellate Division further held that the trial court's decision on the motion to suppress was "supported by substantial credible evidence, [citation omitted] and the issue was properly submitted to the jury."  (Ex. H).

This Court finds that the procedure utilized by law enforcement in the Williams' out-of-court identification was not unduly suggestive.  Further, the claims that Williams either lied

27

or was inconsistent go to credibility, and the defense had the opportunity to attack the credibility of the witness at trial.

This Court finds that the state court adjudication of this claim did not result in a decision that (1) was contrary to clearly established federal law, (2) involved an unreasonable application of clearly established federal law, or (3) was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The state court correctly identified and applied the governing legal rule and reasonably determined the applicable facts. Most importantly, without any indicia of suggestiveness in the photo array, the photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Accordingly, petitioner's claim on this point is denied.

C.   Jury Charge on Out-of-Court Identification

Julien also asserts reversible error in the trial judge's charge to the jury on the out-of-court identification because the trial judge declined to include an instruction that the eyewitness was unable to make an in-court identification of Julien. The respondents argue that jury instructions in state trial are matters of state procedural law not generally reviewable in a federal habeas petition. The State also contends that under State v. Robinson, 165 N.J. 32, 41 (2000), a trial court is not obligated to give fact-specific identification

instructions that comment on apparent weaknesses in the State's identification evidence.

Questions relating to jury charges are normally matters of state law and are not cognizable in federal habeas review.  See Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431 U.S. 145 (1977); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir.), cert. denied, 502 U.S. 902 (1991); Grecco v. O'Lone, 661 F. Supp. 408, 412 (D.N.J. 1987)(Thompson, J.).  Only where the jury instruction is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." Id.

Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522 U.S. 1109 (1998). See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute th crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) )(jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17 (1997); Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Smith v. Horn, 120 F.3d at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

<u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (internal

quotations and citations omitted).

     Here, the relevant charge dealt with the issue of

identification.  Petitioner points out that the charge was

critical because there was only one eyewitness who placed Julien

at the scene, and no direct, physical evidence placed petitioner

there.  The court instructed the jury as follows:

> Now, one item of evidence introduced by the state in
> order to meet its burden with respect to the identification
> of the culprit was the testimony of Mr. Gilly Williams.  You
> will recall that Mr. Williams testified that he identified
> the defendant in a picture as one of the persons Mr.
> Williams saw entering Mr. Davis' apartment.  According to
> Mr. Williams, Mr. Williams identification of the defendant
> is based upon the observations and perceptions he made of
> the defendant on the scene at the time the offense was being
> committed.  It is your function as jurors to determine the
> reliability of this testimony and the weight, if any, to be
> given to Mr. Williams' identification of the defendant and
> his testimony in that regard.
>
> In going about your task you should consider the testimony
> of the witness in the light of the customary criteria with
> regard to credibility that I've previously explained to you.
> It is particularly appropriate that you consider the
> capacity or the ability of the witness to make observations
> or perceptions as you gauge it to be and that you consider
> the opportunity which the witness had at the time and under
> all of the attendant circumstances for seeing that which he
> says he saw or that which he says he perceived with regard
> to his identification of the person who committed the
> alleged offenses.
>
> If after a consideration of all the evidence you have a
> reasonable doubt as to the identity of the defendant as the
> person present at the time and place of the crime, you must
> acquit him.  However, after a consideration of all, if after
> a consideration of all of the evidence you are convinced
> beyond a reasonable doubt of the defendant's presence at the
> scene, you will then go onto consider whether or not the

state has proven each and every element of the crimes
charged beyond a reasonable doubt.

(5T 97:4-98:11).

At the conclusion of the jury instructions, defense counsel
asked the court to add a specific charge on the fact that Gilly
Williams was unable to make an in-court identification.  The
court declined, stating that it was a request for the court to
"improperly comment on the evidence."  (5T 144:5-10).

On state collateral review, the Appellate Division found no
merit to Julien's claim that the trial judge's identification
charge to the jury violated due process.  "The instruction as
given essentially tracked the model charge.  While the trial
judge's charge could have been more closely tailored to the facts
of the case, we cannot fairly say that the instruction was
incorrect or that it otherwise misled the jury. [citation
omitted] We discern no abuse of the trial judge's discretion."
(Ex. U, Appellate Division Opinion on petitioner's appeal from
denial of state PCR petition, filed October 24, 2001).

Upon review of the jury instruction, this Court's review is
limited to asking whether the instruction so infected the entire
trial that the conviction violated due process.  Did it deny
Julien the right to a fair trial?  Did it operate to lift the
burden of proof of an essential element?  The New Jersey
Appellate Division looked closely at this issue and stated that
the charge could have been more closely tailored to the facts,

32

but it did not mislead the jury.  The charge correctly instructs the jury on its role and function in making factual determinations as to the credibility and weight to be given to identification testimony. The charge also reminds the jury that even if they determine that defendant was at the scene of the crime, they must next consider whether or not the state has proven each and every element of the crimes charged beyond a reasonable doubt.  Thus, it is clear that the instructions did not "lift" the burden of proof.  See Sandstrom, 442 U.S. at 523 (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Finally, Julien has not demonstrated that the trial court's jury instructions and the state court's review of the issue on appeal "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

D.  <u>Ineffective Assistance of Trial Counsel</u>

Julien next contends that trial counsel was constitutionally deficient in the following manner: (1) failing to cross-examine

33

Williams with respect to his out-of-court identification; (2)
failing to call investigator Worrell as a witness at trial; and
(3) failure to conduct an adequate investigation in preparation
of the case.

The "clearly established Federal law, as determined by the
Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is
the standard for ineffective assistance of counsel as enunciated
in Strickland v. Washington, 466 U.S. 668 (1984).  Under
Strickland, a petitioner seeking to prove a Sixth Amendment
violation must demonstrate that his counsel's performance fell
below an objective standard of reasonableness, assessing the
facts of the case at the time of counsel's conduct.  Id. at 688-
89; Jacobs v. Horn, 395 F.3d 92, 102(3d Cir. 2005); Keller v.
Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973
(2001).  Counsel's errors must have been "so serious as to
deprive the defendant of a fair trial, a trial whose result is
reliable." Strickland, 466 U.S. at 688.  "In any case presenting
an ineffectiveness claim, the performance inquiry must be whether
counsel's assistance was reasonable considering all the
circumstances." Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential.  It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every

34

       effort be made to eliminate the distorting effects of
hindsight, to reconstruct the circumstances of
counsel's challenged conduct, and to evaluate the
conduct from counsel's perspective at the time.
Because of the difficulties inherent in making the
evaluation, a court must indulge a strong presumption
that counsel's conduct falls within the wide range of
reasonable professional assistance; that is, the
defendant must overcome the presumption that, under the
circumstances, the challenged action "might be
considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v.
Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S.
1020 (1996).

      If able to demonstrate deficient performance by counsel,
Julien must next show that counsel's substandard performance
actually prejudiced his defense.  Strickland, 466 U.S. at 687.
Prejudice is shown if "there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different.  A reasonable probability
is a probability sufficient to undermine confidence in the
outcome."  Id. at 694.  The reviewing court must evaluate the
effect of any errors in light of the totality of the evidence.
Id. at 695-96.  Thus, the petitioner must establish both
deficient performance and resulting prejudice in order to state
an ineffective assistance of counsel claim.  Id. at 697.  See
also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

      1.  *Failure to Cross-Examine Witness Williams*

Petitioner asserts that his counsel's performance at trial was deficient because he failed to cross-examine an eyewitness on an out-of-court identification.  Julien states that the witness' testimony at the <u>Wade</u> hearing showed many inconsistencies in his statement to the police.  It also showed discrepancies as to the description he gave police as to the culprit's height and age and Julien's actual height and age.  Williams also was unable to identify Julien in court as the man he saw the night of the murder.  In short, petitioner argues that, given the lack of direct, physical evidence that Julien was one of the culprits at the scene of the victim's apartment, and the fact that Williams' testimony and Stephen Beisser's testimony were the only circumstantial evidence against petitioner elicited at trial, trial counsel was constitutionally ineffective in failing to cross-examine Williams to undermine his out-of-court identification.

The trial court rejected this claim in the state PCR proceeding, finding that the decision by trial counsel was "clearly strategy", and "given the testimony of Mr. Williams the Court cannot say that strategy was so unreasonable that to fall below the basic standard of competency of trial counsel."  (9T 11:9-12).  The court further stated in its August 9, 1999 letter opinion, that counsel acknowledged at trial that:

> Because of the events in the trial or the ability, in particular of Mr. Williams to identify my client at trial,

> I elected not to cross-examine him nor call Mr. Worrell to
> allow the prosecutor to recall Mr. Williams to try to open
> up other avenues of testimony.  So, it was a tactical
> decision I made.  (3T 175:3-8).

(Ex. P, at pg. 6).  The trial court concluded:

> Defense counsel's strategic decision in regard to Williams
> and Worrell cannot be said to be "beyond the realm of
> objectively reasonable representation." [citation omitted]
> With regard to Williams, defense counsel already had,
> through Williams' direct, that which most defendants hope to
> get through cross-examination – an admission that Williams
> could not make an in-court identification.  To cross-examine
> him would have been to provide the State with an opportunity
> to rehabilitate that testimony.  Defense counsel also
> already had before the jury Williams' testimony that,
> although he told the picture was of the guy that went into
> the apartment, he picked the picture because it "looked
> like" the guy.  To have continued questioning Williams after
> this concession would have been to risk a repetition of
> Williams' more damaging <u>Wade</u> testimony – it didn't just
> "look like" the guy, but rather looked "<u>just</u> like the guy."
> [emphasis added].

(Ex. P, at pg. 7).

On appeal from denial of the PCR petition, the Appellate

Division found:

> the record indicates that counsel's decision not to cross-
> examine the witness constituted a strategic choice that is
> "virtually unchallengeable." [citations omitted] Williams'
> testimony on direct examination was highly equivocal.  Among
> other things, Williams was unable to make a positive in-
> court identification.  Defense counsel's decision not to
> cross-examine the witness thus constituted a strategic and
> tactical choice falling within the "broad zone of attorney
> discretion." [citation omitted].

(Ex. U, at pg. 2).

Given trial counsel's admission that his decision not to

cross-examine Williams was a strategic choice, and Williams'

testimony at trial and the <u>Wade</u> hearing tends to support that

37

tactical decision,[5] this Court will not second guess counsel's strategy and will duly accord that decision with the deference exhorted by Strickland.

Further, the Court finds that the state courts did not unreasonably apply established federal law in reaching their decisions.  The state court decisions were based on a reasonable application of the facts in light of the evidence presented at trial.  Thus, Julien has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Accordingly, this claim of ineffective assistance of counsel is without merit.

    2.  *Failure to Call Worrell as a Witness*

Julien next argues that trial counsel was deficient in not calling the investigator Worrell as a witness to impugn the reliability of Williams' out-of-court identification.  Again, at the state PCR proceeding, the trial judge found that the decision of Julien's counsel not to call Worrell was a strategic choice. (9T 11:7-12).  In its letter opinion, the court further elaborated:

---

    [5]  The Court notes from the record that Williams would not, or could not, identify Julien at trial.  Further, if trial counsel had cross-examined Williams, the State would then have the opportunity on re-direct to rehabilitate Williams' testimony with respect to the out-of-court identification.

As to the failure to call Worrell, if counsel had called
Worrell it would have provided the State the opportunity, as
noted by counsel, "to recall Williams, to open up other
avenues of testimony."  To have called Worrell could
actually have hurt the defendant.  Worrell would have
testified that Williams denied the undeniable – Williams
denied ever having given a statement to police.  Worrell
would also have testified that Williams threatened to flee
rather than testify.  Worrell's testimony about Williams'
statements, coupled with Williams' direct testimony that
Williams was scared to get involved, could have led the jury
to speculate as to a reason why Williams failed to make an
in-court identification that had nothing to do with a
claimed uncertainty as to the identity of the defendant as
one of the persons Williams saw enter the apartment.  Trial
counsel's strategic decisions provide defendant no avenue of
relief.

(Ex. P. At pg. 7).

The Appellate Division affirmed denial of Julien's PCR

petition, remarking:

Defense counsel's decision not to present Worrell as a
witness is equally unassailable.  At the identification
hearing, Worrell recounted that Williams told him he
selected defendant's picture from a photographic array only
because the police told him another witness had identified
defendant as the culprit.  However, Williams testified that
he felt pestered by Worrell and that he just wanted Worrell
to "leave him alone."  Worrell served as an investigator for
the Public Defender's Office.  Defense counsel clearly did
not want to create the appearance that the defense was
attempting to coerce or cajole the witness, particularly in
light of Williams' highly equivocal trial testimony.  We
stress that lawyers are not required to call every witness
suggested to them.  This is precisely the type of strategic
decision the United States Supreme Court in <u>Strickland v.
Washington</u>, [citation omitted] held to be protected from
second guessing.  As emphasized by Judge Schott, defense
counsel's tactical decision was well within the realm of
objectively reasonable representation.

(Ex. U, at pg. 3).

Thus, for the same reasons as set forth above with respect to petitioner's claim regarding trial counsel's failure to cross-examine Williams, this Court finds this claim, that counsel was deficient in failing to call Worrell as a witness at trial, to be equally without merit.

3.  *Failure to Conduct an Adequate Investigation*

"[A]n attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997); Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990)(counsel has a duty to investigate or to make a reasonable decision that makes particular investigations unnecessary).  When assessing an ineffectiveness claim based on failure to investigate, a court must assess the decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); see also Duncan v. Morton, 256 F.3d 189, 201 (3d Cir.), cert. denied, 534 U.S. 919 (2001).  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 691-92.  Even if counsel was deficient in his decision not to investigate, a petitioner must show a reasonable likelihood that, but for the deficiency,

the result of the proceeding would have been different.   Lewis,
915 F.2d at 115.

It is firmly established that a court must consider the
strength of the evidence in deciding whether the second prong
under Strickland, i.e., prejudice, has been satisfied.   A court
"must consider the totality of the evidence before judge or
jury."   Strickland, 466 U.S. at 695.   This is necessary because
prejudicial error by counsel requires a court to determine
whether there is a reasonable probability that, but for counsel's
errors, the trial result would have been different.   Id.; Flamer
v. Delaware, 68 F.3d 710, 728 (3d Cir. 1995), cert. denied, 516
U.S. 1088 (1996).   A court simply cannot make this determination
without considering the strength of the evidence against the
defendant.

The principal argument asserted by petitioner here is that
trial counsel did not adequately investigate and prepare a
defense on the first degree robbery charge.[6]   The State's case
with respect to the robbery charge was based on the testimony of
the victim's girlfriend, Dina Bryant.   Ms. Bryant stated that

---

[6]   Julien notes that he was acquitted of all charges except
robbery and felony murder.   Since felony murder is predicated on
the murder of someone during the commission of a felony, in this
case armed robbery, then an acquittal on the robbery charge would
necessitate an acquittal on felony murder.   Petitioner also notes
that his counsel was obviously aware of the importance of the
robbery charge when he made a motion to dismiss the charge after
the presentation of the State's evidence.   The motion was denied.

41

while she was in the hospital the victim came to visit her that day shortly before the murder.  She testified that the victim was wearing a watch, gold chain and a gold bracelet.  The police did not find these items after the victim's murder.  Ms. Bryant further testified that upon her return home from the hospital, she noticed that a pair of her sneakers, eight rings, and a beeper, which was in the victim's possession, were missing also.

Through the police report and the statements of witnesses, which counsel had been provided in discovery, counsel was aware that many persons had entered the apartment after the victim was killed.  Julien argues that counsel never investigated and questioned these witnesses about whether they saw anyone taking anything from the apartment.

Counsel also never investigated the fingerprint evidence. Only four useable fingerprints were found at the apartment.  They were not the fingerprints of Julien, Dina Bryant (who lived in the apartment), the victim, or another suspect, Hillary Edwards. Petitioner states that his counsel should have investigated the identity of the fingerprints since one set was found on a "cold" can of beer, which would suggest that the person was recently in the apartment.

Julien also contends that counsel was deficient in failing to interview pertinent witnesses who were present in Stephen

42

Beisser's apartment at the time the petitioner allegedly made incriminating statements to Beisser about killing someone.

The state PCR court rejected each of these claims.  The court stated that it was presented with "nothing that would indicate that that investigation would have produced results that Mr. Julien seems desirous of them producing.  There's been no affidavits from any witnesses.  There's been no tangible items of evidence submitted to the Court that would indicate that the matters that Mr. Julien wished to have investigated would have produced any evidence different from that which was produced at trial."  (9T 11:13-20).

The court ruled that in the absence of such a showing, petitioner had failed to sustain his burden of proving the second prong under <u>Strickland</u>, that is, prejudice, or that there would have been an effect on the outcome of the trial.  (9T 11:21-12:1).  In a letter opinion, the trial court further concluded that defendant:

> presented no evidence that the investigation he now argues should have been conducted would have actually produced any evidence.  He argues that independent interviews may have produced a statement that one of the witnesses saw another of the witnesses take something from the apartment.  Such interviews may also have produced no such evidence.  In this regard the witness statements provided in discovery make no mention of observation of such activity.  Defendant argues further pursuit of the fingerprints on the beer can might have shown a match to one of the crime scene witnesses.  Further pursuit of the prints might have shown no such thing.  In the absence of some competent proof that the investigation would have actually produced different evidence at trial, defendant cannot be said to have

> demonstrated a reasonable probability that, but for a
> failure to investigate, the result of the trial would have
> been different.  See Strickland, 466 U.S. at 687.

(Ex. P, Letter Opinion of PCR court, dated August 9, 1999).  The
court also remarked that further investigation to show the
fingerprints on the cold can of beer matched one of Williams'
friends would not necessarily affect the outcome of the case.  In
any event, it was not necessary since Williams had already
testified that he and his friends had entered the apartment, so
the fingerprint evidence would be unnecessary to establish their
presence.  (Id.).

     As to the witnesses at Beisser's apartment, the court found
that there was nothing presented by petitioner that would imply
their testimony would have been any different than Beisser.
Further, petitioner did not show the court any evidence "to imply
that 'Fat Cat', who refused to be interviewed by the police,
would have provided defense counsel with any exculpatory
evidence."  (Id.).

     On appeal from denial of Julien's PCR petition, the
Appellate Division found petitioner's arguments "devoid of
substance."  The court held that "[t]he claim that other persons
stole articles from the victim's apartment long after the killing
is pure conjecture.  Nothing was presented below or here that
would support this highly speculative thesis.  In the absence of
some competent proof that additional investigation would have

44

produced exculpatory evidence, we cannot find any merit in
defendant's claim. (Ex. U).

This Court observes that trial counsel is only required to
make "reasonable investigations or to make a reasonable decision
that makes particular investigations unnecessary." See
Strickland, 466 U.S. at 691. Here, without determining that
trial counsel was deficient in investigating and preparing a
defense, it is plain from the lack of evidence produced by
petitioner that he could not have met the second prong under
Strickland, that is, that the investigation would have resulted
in a different outcome at trial. It appears from the weight of
the evidence presented at trial that the jury would not have
reached a different verdict.

Further, upon review of the trial record, the Court finds
that trial counsel ably represented petitioner with a clear
understanding of the evidence, witnesses and the critical issues
in the case. It cannot be said that he was ill-prepared to
defend petitioner. Therefore, the Court concludes that Julien is
not entitled to habeas relief based on allegations that trial
counsel failed to investigate and prepare a defense. There is no
indication that the state courts unreasonably applied established
federal law in reaching their decisions, or that the state court
decisions were based on an unreasonable application of the facts
in light of the evidence presented at trial. Julien has not

demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.

E.   Ineffective Assistance of Appellate Counsel

Petitioner broadly asserts that his appellate counsel was ineffective in violation of his constitutional rights for his failure to raise obvious issues of error that were meritorious and would have likely led to his conviction being reversed on appeal.  In his state PCR petition, the claim relating to the ineffectiveness of appellate counsel was limited to counsel's failure on appeal to challenge the trial court's refusal to remind the jury that Williams failed to make an in-court identification.  The trial court had stated that that was "a request for me to improperly comment on the evidence."  (4T 144:5-10).

Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard previously discussed. See  Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004).  In rejecting petitioner's claim, the trial court held that:

> To demonstrate ineffectiveness of Appellate counsel, defendant must demonstrate that if this claimed error in refusing to comment on the evidence had been raised, the defendant's conviction would have been reversed.  This the defendant cannot do, for the Appellate Division has most recently made clear the propriety of a trial court's refusal to make such comments. [citation omitted] ...

46

Defense counsel in the within matter met this responsibility and argued in his closing all issues regarding identification.  (4T 20:20-22:9).

As Walker makes clear, any challenge to the Court's ruling refusing the requested comment would not have caused a different result in the Appellate Division.  Defendant's claim of ineffective assistance of Appellate counsel hence provides him no avenue of relief.

(Ex. P, at pp. 9-10).

Affirming the PCR decision on appeal, the Appellate Division found that appellate counsel was not ineffective for failing to raise this point on direct appeal because there was no abuse of the trial judge's discretion with respect to the jury charge on identification.  (Ex. U, at pg. 4).

In order to prevail on a claim that appellate counsel was ineffective, Julien must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Here, Julien has failed to show that the performance of his appellate counsel was deficient and that he was prejudiced thereby, and in light of the evaluation of this issue by the state courts, this Court cannot conclude that that the determination of this issue resulted in a decision that was contrary to, or involved an unreasonable application or

determination of law or fact.  <u>Williams v. Taylor</u>, <u>supra</u>.
Accordingly, the Court will deny relief on this claim.[7]

F.  <u>Cumulative Errors</u>

Finally, Julien asserts that the cumulative effect of trial
errors deprived him of his due process and his constitutional
right to a fair and impartial trial.

Even if none of the claims on its own amounts to a
constitutional violation, the "cumulative effect of the alleged
errors may violate due process."  <u>United States ex rel. Sullivan
v. Cuyler</u>, 631 F.2d 14, 17 (3d Cir. 1980); <u>Pursell v. Horn</u>, 187
F. Supp.2d 260, 374 (W.D. Pa. 2002) ("That the reliability of a
state criminal trial can be substantially undermined by a series
of events, none of which individually amounts to a constitutional
violation, is an idea that has been accepted by nearly every
federal court to have addressed the issue.").[8]  In <u>Marshall v.</u>

----

[7] To the extent that Julien includes all of trial counsel's
alleged errors as part of his claim that appellate counsel was
ineffective for failing to raise them on appeal, the Court finds
that such a claim lacks merit.  For the reasons stated in this
Opinion, <u>supra</u>, at pp. 35-45, Julien has not shown that his
appellate counsel's decision not to include these arguments on
appeal fell below an objective standard of reasonableness.  More
importantly, Julien has not shown that there is a reasonable
probability that had such arguments been presented on appeal,
they would have been meritorious.

[8] Neither the Supreme Court nor the Court of Appeals for
the Third Circuit has established a standard by which a claim of
cumulative error must be determined.  <u>See</u> <u>Pursell</u>, 187 F. Supp.2d
at 374-76 (describing three alternative approaches).

<u>Hendricks</u>, the Court of Appeals for the Third Circuit evaluated a cumulative error claim and found:

> Here, even were we to cumulate all the claimed errors and superimpose them over the extensive trial proceedings, given the quantity and quality of the totality of the evidence presented to the jury, we could not conclude that the New Jersey Supreme Court unreasonably applied Supreme Court precedent or unreasonably determined the facts in making its ruling.

<u>See</u> 307 F.3d 36, 94 (3d Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 911 (2003).

As found in <u>Marshall</u>, <u>supra</u>, Julien has not demonstrated that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  This conclusion is the same when the claimed errors are cumulated. Accordingly, this ground for a writ of habeas corpus will be denied.

## V.  <u>CERTIFICATE OF APPEALABILITY</u>

The Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For

the reasons discussed above, this Court's review of the claims advanced by Julien demonstrates that he failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the foregoing reasons, this Court finds that Julien's § 2254 habeas petition should be denied on the merits.  A certificate of appealability will not issue.   An appropriate Order accompanies this Opinion.


      /s/ Faith S. Hochberg
United States District Judge


DATED:  September 19, 2005

50